

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Barbara Fischer,                    )
                                    )
            Plaintiff,              )
                                    )       No. 05 C 5594
v.                                  )
                                    )       Honorable William J. Hibbler
Avanade, Inc.                       )
                                    )
            Defendant.              )

## MEMORANDUM OPINION AND ORDER

Plaintiff Barbara Fischer brings the present two-count Complaint alleging gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000(2) et seq*. against her former employer Defendant Avanade, Inc. ("Avanade"). Before the Court is Avanade's motion for summary judgment pursuant to *Federal Rule of Civil Procedure 56(c)*. For the reasons set forth below, the Court GRANTS Avanade's motion.

### I. FACTUAL BACKGROUND

#### A. Avanade Performance Rating System

Avande is a technology integrator firm specializing in Microsoft enterprise platform. As a part of its employment practices, Avanade performs annual evaluations of its employees' performance through a structured review process and allocates the ratings through percentage guidelines. During the annual evaluations employees receive overall ratings though targeted percentage guidelines. Specifically, employees are rated: "exceptional" (5-10%); "exceeds expectations" (35-49%); "meets expectations" (45-50%); or "does not meet expectations/requires improvement" (3-8%).

In addition, in evaluating employees' performances, Avanade utilizes Performance Management Guidelines and assigns skill levels to its non-exempt employees. Prior to October 2003, employees were assigned skill levels from Level 1 (lowest) through Level 4 (highest). In October 2003, Avanade instituted a new skill level system whereby employees' skills where assessed in increments of five from Levels 10 through 70. The equivalent levels under the old and new leveling system correspond as follows:

> Level 1 = Levels 20 and 25;
> Level 2 = Levels 30, 35, and 40;
> Level 3 = Levels 45, 50 and 55;
> Level 4 = Levels 60, 65 and 70.

Upon instituting the new skill level system, Avanade assessed each employee's skill level to the employee's performance level. Generally, Avanade promotes employees incrementally from one skill level to the next. Additionally, Avanade's fiscal year is from October 1 through September 30.

B. Barbara Fischer

In May 2001, Avanade hired Barbara Fischer to work as a Program Management Consultant ("PM"), Level 3, in its Central Region delivery management practice, headquartered in Chicago, IL. (Def. 56.1(a) Statement ¶ 2; Fischer Dep. at 85). Prior to working for Avanade, Fischer had several years of experience in the technology field. Specifically, from 1991 through 1998, Fischer owned a technology business responsible for assisting customers to evaluate and implement various software applications; however, she was not employed with a commercial consulting firm until 1998. Initially, Plaintiff was supervised by Don Evans ("Evans"), at that time the Delivery Management Practice Director ("DPMD") of the Central Region. (Id). Later

2

that year, in October 2001, Fischer received an overall performance rating of "meets expectations" on her annual evaluation. (Def. 56.1(a) Statement ¶ 12).

In July 2002, Avanade assigned Plaintiff to assist in a series of proposals toward attaining governmental projects for the company. Fischer's efforts ensured that federal and state officials were of aware of Avanade and led one federal agency to reopen its opportunity so that Avanade could be considered for the award. (Pl. 56.1(b)(3)(A) Response ¶84). However, due to Avanade's status as a newcomer in the government engagements, Avanade was not granted any awards in 2002. (Id.) Along with the assignment to various proposal efforts, Fischer was assigned to internal administrative projects for the Central Region, such as being the Staffing Coordinator. (Def. 56.1(a) Statement ¶ 13; Pl. 56.1(b)(3)(A) Response ¶ 85). Avanade also assigned Fischer to a "billable" conversion project, where her role was to assist the client in adapting to the new technology. On this project, Fischer worked directly with the client, Federal Home Loan Bank of Chicago ("FHLBC") and reported to Rita Seroski ("Seroski"), an Avanade senior Project Manager assigned to the project. (Def. 56.1(a) Statement ¶ 13).

In October 2002, James Brennan ("Brennan"), Plaintiff's career manager, completed Fischer's annual evaluation based on comments received from Evans and Seroski, as well as his review of documents from Fisher's "billable" conversion project. The evaluation noted that Fischer had not met her billable goals for the fiscal year; that although Fischer managed various proposal efforts, these proposals had not lead to engagements; and that her involvement on the one billable project had led to "strained" relationship with one of Avanade's major clients. Consequently, Fischer received an overall performance rating of "does not meet expectations" on her 2002 annual evaluation. (Def. 56.1(a) Statement ¶ 16.) In addition, Avanade placed Fischer

3

on a Performance Improvement Plan ("PIP"). (Def. 56.1(a) Statement ¶ 20.) Pursuant to the PIP, Fisher's primary objectives were to perform successfully on a billable project and assist in the development of the Avanade Project Management body of knowledge. (Id.) Fischer subsequently submitted a rebuttal to the evaluation, which was not included in her file. (Pl. 56.1(b)(3)(A) Response ¶ 16).

From October, 2002 through May or June 2003, Avanade assigned Plaintiff as a Program Manager for the treasury pricing model application project ("TPM") at FHLBC. (Def. 56.1(a) Statement ¶ 21). As the program manager for this project, Fischer managed five to six individuals. (Id.) For the 2003 fiscal year, Robert Fahey ("Fahey") was Plaintiff's career manager. (Def. 56.1(a) Statement ¶ 28). While Fahey provided informal feedback to Fischer on her performance throughout the year, he did not complete an annual review for Plaintiff or any other PMs for whom he served as career manager for the 2003 fiscal year. (Id.) Nonetheless, Plaintiff received an overall performance rating of "exceeds expectations" for the 2003 fiscal year. (Def. 56.1(a) Statement ¶ 29). That year Fischer received a merit increase in her salary from $130,000 to $134,000 and received a performance bonus of $1,400. (Id.)

In September 2003, Avanade created the Strategic Accounts Region to serve two of its largest clients, one of which was the FHLBC of Chicago. (Def. 56.1(a) Statement ¶ 28). Avanade gave employees working in the Central Region the option of either joining the new Strategic Accounts Region or remaining with their original region. (Id.) Plaintiff Fischer decided to transfer to the Strategic Accounts Region located in Chicago. (Fischer Dep. at 85). In October 2003, Howard Kilman ("Kilman"), at that time Central Region General Manager, appointed Joseph Mendel ("Mendel") as the General Manager of the Strategic Accounts Region.

4

Kilman also named Evans the Central Region Technology Infrastructure Practice Director and Brennan as acting Central Region DPMD.

From approximately, November 2003 to December 2004, Plaintiff was assigned to manage the Strategic Accounts Project Management Office, where she supervised the budgetary and contractual aspects of the projects for FHLBC, which included monitoring billable time. In this role, Fischer, in part, managed the time and expense reporting of the consultants and was able to attain 100% compliance for the Strategic Accounts region during this period. During this time, Mendel recognized Plaintiff's efforts in contribution memos, which rated Fischer's performance as "exceeds expectations" and "exceptional" during the period of September 2003 through February 2004. (Pl. 56.1(b)(3)(A) Response ¶ 89).

Additionally, soon after his appointment as Strategic Accounts GM, Mendel announced several open leadership positions within the new region, including the Strategic Accounts Delivery Management Practice Director ("DMPD") position. The DMPD position responsibilities entailed, in part, management of delivery operations, relationship building with clients, and required interpersonal leadership skills necessary to create a cohesive team. Further, the October 2003 position announcement stated that the minimum requirements were, in part:

> Minimum Requirements:
> • Proven track record in leading the delivery of consulting projects using Microsoft technologies . . .
> • Proven track record of leadership during opportunity and proposal phases of sales cycle
> • Enterprise experience with Microsoft Operating Systems or Development Tools
> • Demonstrated strong customer service and oral and written communication skills
> • Established consulting expertise with 10+ years of experience
> • Demonstrated understanding of development methodologies and tools . . .

5

Avanade argues that Microsoft Professional certification was not required of this position. Taking the facts in the light most favorable to Plaintiff, however, the Court finds that Plaintiff has presented evidence that Microsoft certification was required of this Level 55 position. Further, individuals at the more senior levels were expected to have a grasp of Microsoft technology and obtain various certifications, such as Project Management Professional ("PMP"). Plaintiff and Joe Sieverding, another Avanade employee, applied for the DMPD position and were interviewed by Mendel, Evans, and Kilman.

After conducting interviews for the DMPD position, with internal and external candidates, Mendel decided not to hire either Fischer or Sieverding for the position. Despite Defendant's assertion otherwise, taking the facts in the light most favorable to Plaintiff, Mendel did not hire Fischer for the position because she "did not understand the business leadership requirements of the job and the job was never created. (Mendel Dep. at 37). Instead, Mendel assigned Sieverding and Fischer to share the responsibilities of the Strategic Account DMPD position so that he could assess their capabilities for the position. (Def. 56.1(a) Statement ¶ 38). Along with the shared responsibilities, Fischer and Sieverding were required to maintain their billable assignments. After informing Plaintiff, that she and Sieverding would share the DMPD responsibilities, Plaintiff expressed concern to Mendel that Sieverding's status as a Level 60 and her current status as a Level 50 would cause issues when Plaintiff sought to direct Sieverding to perform tasks. In response, Mendel raised Plaintiff's status to a Level 55 on November 2003, however, the level increase did not result in an increase in Plaintiff's salary.

In March 2004, Mendel reopened the Strategic Accounts DMPD position. In May 2004, Fischer again interviewed with Mendel for the position. Later that month, Mendel selected

6

Robert Lewis ("Lewis"), another Avanade employee for the Strategic Accounts DMPD position. In addition, that same month Don Evans appointed Sieverding to the role of acting Central Region DMPD. Evans did not recall posting the position before awarding it to Sieverding, nor did he interview any other candidates. (Evans Dep. at 11). Subsequently in October 2002, Evans selected Sieverding to permanently fill the Central Region DMPD position.

In June 2004, after some of the responsibilities of the DMPD position were transitioned from Fischer to Lewis, Plaintiff was assigned to reviewing FHLBC contracts, which differed from previous duties of creating contracts for clients. Fischer also maintained the primary responsibility for managing the Strategic Accounts PMO infrastructure, maintaining contract validity, and interacting with the FHLBC on contract issues. In October 2004, Lewis completed Fischer's annual performance review, which resulted in an overall rating of "meets expectations". Plaintiff received a performance bonus, but there was no change in her salary. The next month Fischer was removed from the FHLBC project.

In 2003 and 2004, Plaintiff complained to Mendel regarding a small group of male employees attending "morale building" dinners at gentleman's clubs. (Pl. 56.1(b)(3)(A) Response ¶ 89). After complaining about the meetings, Mendel criticized Plaintiff about her abrupt or curt behavior and emails to other Avanade employees. (Fischer Dep. at 101). On April 11, 2005, Fischer, and several other female Avanade employees, participated in conference call with Mitch Hill, Avanade CEO, to discuss the alleged gender bias issues at Avanade. After the call Laura Rafferty, one of the participants, forwarded a lists of issues and recommendations from the group reflecting Avanade's "male dominated culture," and that less experienced males were being selected for positions rather than more senior female employees. Later that month,

7

Rafferty requested a follow-up conference call to address the concerns presented during the call and the document. In response, Eric Friedman ("Friedman"), Avanade's Director of Human Resources submitted a document containing Avanade's response and thoughts on the recommendations. Additionally, Avanade management responded that it needed more information to properly investigate and address the issues presented in the document. Avanade further requested that the women needed to come forward individually so that Avanade could address their specific grievances.

On June 28, 2005, Mike Slattery ("Slattery"), at that time Strategic Accounts General Manager, informed Spielmann and Lewis that he wanted to document Fischer's performance as "does not meet" or "requires improvement." In addition, Slattery requested that Fischer's time entries be monitored for the reminder of the year. On July 21, 2005, Plaintiff filed an EEOC claim alleging that Avanade discriminated against her because of her sex and failed to promote her. Subsequent to the filing of her complaint, Plaintiff was subjected to audits of her cellphone and her broadband expenses which were previously authorized. (Fischer Dep. at 122). Further, sometime after August 1, 2005, Friedman contacted Fischer after being informed of her EEOC complaint, and asked her "what is it that you are looking for." Shortly, thereafter, Fischer informed Slattery and Lewis that she had filed an EEOC complaint alleging discrimination. In an email dated August 6, 2005, Lewis recommended that Slattery not issue Fischer's Personal Contribution Form because "providing this feedback at this time would seem like retaliation." (Pl. 56.1(b)(3)(A) Response ¶ 118). Additionally, in August 2005, as a part of Avanade's performance review process, Mike Slattery issued a Personal Contribution Form containing a

8

negative assessment of Fischer's participation on the Strategic Accounts leadership team and her lack of career counseling.

During this period, in April 2005, Avanade restructured the Strategic Accounts Region into the U.S. Delivery Center ("USDC"), effective October 1, 2005. On July 19, 2005, Slattery discussed with Plaintiff Avanade's requirement that she be based in Chicago. During this conversation, Fischer informed Slattery of her desire to stay in Iowa. In response, Slattery told Fischer that she could remain in Iowa by taking a position with the Central Region or in the Avanade's Americas section for fiscal year 2006. On August 30, 2006, Mendel offered Fischer a lateral position with the Central Region delivery management practice. Plaintiff accepted this position in mid-September 2005. On September 30, 2005, Plaintiff submitted her resignation effective October 15, 2005. On February 16, 2006, Plaintiff filed another EEOC claim, alleging that Avanade retaliated against her and that she was constructively discharged.

## II.Analysis

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). All facts and inferences are viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255. The party opposing summary judgment, however, must go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. *Id.* at 250. And neither "the mere existence of some alleged factual dispute between the parties," *Id.* at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct.

9

1348, 89 L.Ed.2d 538 (1986), is sufficient to defeat such a motion. Further a party cannot manufacture a conflict by submitting an affidavit that contradicts an earlier deposition. *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 532 (7th Cir. 1999). Nor can a plaintiff defeat a motion for summary judgment in the context of employment discrimination with conjecture or speculation regarding the employer's motives. *Abioye v. Sundstrand Corp.*, 164 F.3d 364 (7th Cir. 1998). The role of this Court is to determine "whether the evidence presents sufficient disagreement to require submissions to a jury or whether it is so one-side that one party must prevails as a matter of law." *Anderson*, 477 U.S. at 251-52. A court is not "required to evaluate every conceivable inference which can be drawn from evidentiary matter, but only reasonable ones." *Little v. Cox's Supermarkets*, 71 F.3d 637, 643 (7th Cir. 1995).

A. Discrimination Claims

1. Untimely Acts of Discrimination

Fischer alleges sex discrimination in violation of Title VII. Title VII sets forth the relevant time for filing charges as follows:

> . . . in case of an unlawful employment practice with respect to which the person has initially instituted proceeding with a State or local agency with authority to grant or seek relief from such practice or institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred. . . .

42 U.S.C. § 2000e-5(e)(1). The 300-day limit . . . begins to run when the defendant has taken the action that injures the plaintiff and when the plaintiff knows she has been injured, . . . not when [the plaintiff] determines that the injury was unlawful." *Sharp v. United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001)(internal citations omitted). Discrete acts that fall within the statutory

10

time period do not make timely acts that fall outside the time period. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. at 112. In Morgan, the Supreme Court opined that:

> First, discrete discriminatory acts are not actionable if time-barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging the act. The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.

*Id.* at 114-115. Discrete discriminatory acts includes acts such as termination, failure to promote, denial of a transfer, or refusal to hire. *Id.* at 114. Title VII does not "bar an employee from using the prior acts as background evidence in support of a timely claim." *Id.* In this case, Plaintiff Fischer filed her EEOC charges alleging discrimination on July 21, 2005. Therefore, discriminatory acts based on race or age that allegedly occurred before September 24, 2004, 300 days before the charges were filed, are not actionable under Title VII. Consequently, all of Fischer's claims occurring prior to that date are time-barred. Plaintiff argues that the untimely claims demonstrate a "pattern and practice" of discriminatory behavior by Defendant. The Seventh Circuit has held that in individual disparate treatment cases, pattern and practice evidence can only be used collaterally to help establish pretext or specific discrimination against the employee. *Gilty v. Village of Oak Park*, 919 F.2d 1247, 1252 (7th Cir. 1990).

### 2. Failure to Promote

The Plaintiff alleges that Avanade discriminated against her when it failed to promote her because of her gender, in violation of Title VII of the Civil Rights Act of *1964, 42 U.S.C. §*

11

*2000e et seq.* Under Title VII it is unlawful for any employer "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2.* A plaintiff may defeat a summary judgment motion in a failure to promote because of her gender origin can proceed under either the direct or indirect method. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed. 668 (1973); *Jordan v. City of Gary, Ind.* 396 F.3d 825, 831 (7th Cir. 2005). Under the direct method, the plaintiff must offer either direct evidence - some type of admission by the decision maker of a discriminatory animus - or a "convincing mosaic" of circumstantial evidence that points directly to a discriminatory reason for the employer's action. *Id.* at 832.

Here, Plaintiff points to no direct evidence. Thus, Plaintiff must rely on the indirect method. Under that method, a Plaintiff alleging a failure to promote, must show: (1) she is a member of a protected group; (2) she was qualified for the position sought; (3) she was rejected; and (4) the employee promoted was not a member of the protected group and was not better qualified than the plaintiff. *Johnson v. Nordstrom,* 260 F.3d 727, 732 (7th Cir. 2001). In order to establish a material adverse action in the failure-to-promote context, the plaintiff must show that he was rejected for that position. *Grayson v. City of Chicago,* 317 F.3d 745, 748 (7th Cir. 2003). In the context of failure-to-promote claims where the employer argues that it selected the more qualified candidate, to demonstrate pretext a plaintiff must establish that his qualifications "so superior to the credentials of the person selected . . . that no reasonable person . . . could have chosen the candidate selected." *Millbrook v. IBP, Inc.,* 280 F.3d 1169, 1180 (7th Cir. 2002).

Fischer's sole timely claim pursuant to Title 7 involves Sieverding's October 2004

12

appointment to Central Region DPMD. Plaintiff, however, fails to establish a prima facie claim of discrimination. Defendant concedes that Plaintiff is a member of a protected class – female; therefore, meeting the first prong of the test. Avanade asserts that Sieverding was more qualified than Plaintiff for the position. Fischer, on the other hand, contends that Avanade's reasons for selecting Sieverding over Plaintiff for the position are pretextual. Further, Fischer contends that Avanade failed to follow internal procedures for posting the position demonstrates that its reasons are pretextual. However, failure to follow company policy is insufficient to demonstrate an employer's reasons for its decision are discriminatory. *Walker*, 416 F.3d at 641. Notably, the Court has no evidence reflecting that Avanade had a policy requiring all positions to be posted.

Plaintiff next argues that she was more than qualified for the position. Fischer cites to her numerous years of experience as a technological consultant, her responsibilities with the FHLBC, her various certifications, and her demonstrated success in her position at Avanade. An employees own perception of her performance "cannot tell a reasonable factfinder something about what the employer believed about the employee's abilities." *Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 602 (7th Cir. 2001).

Avanade hired Joe Sieverding in March 2003 as a Program Manager, Level 3, for the LOS 7.1 project also at FHLBC. (Sieverding Dep. at 9). Prior to hiring Sieverding as the PM for the LOS 7.1 project, the project had numerous problems and Sieverding was hired in an attempt to resolve several issues with the scope of the project, its budget, and its final release date. (Def. 56.1(a) Statement ¶ 25). Fischer points to the fact that during Sieverding's tenure as Project Manager for the FHLBC LOS 7.1 project, Lisa Blessington ("Blessington"), an Avanade Project Coordinator, conducted an audit for the Los 7.1 project. (Blessington Dep. at 17). Blessington's

13

audit uncovered several instances in which Sieverding failed to obtain written change requests for the project, contrary to Avanade policy and procedure and which resulted in Avanade having to credit the bank several hundred thousand dollars in uncompensated work. (Blessington Dep. at 20; Pl. 56.1(b)(3)(A) Response ¶ 26). Further, at the time of his appointment, Sieverding had less than 9 years of project management experience and was not MCP or PMP certified. Fischer also reiterates that in Sieverding's 2004 annual evaluation, Evans noted that the undocumented costs in the FHLBC LOS 7.1 project could have resulted in a "financial exposure to Avanade" and also stated that Sieverding "failed to build [sic] great relationship with the key leadership in the bank." Nonetheless, Sieverding received a "meets expectations" rating in the "Project Role Accountability & Service Delivery" section of his annual review. The facts demonstrate that, at the time of his appointment, Sieverding had over ten years experience with technological consulting and project management. Further, according to Evans, Sieverding successfully managed the largest project of any Avanade delivery manager. (Evans Dep. at 208). This Court's role is to prevent discrimination, not to act as a super personnel department. *Millbrook*, 280 F.3d at 1181. Fischer can establish neither that Avanade's reasons for appointing Sieverding instead of Fischer were pretextual nor that her credentials are so superior to Sieverding's that no reasonable person could have chosen him for the supervisory position.

### 3. Constructive Discharge

Fischer claims that Avanade constructively discharged her. This claim merits little discussion. A claim of constructive discharge requires a showing that: (1) the plaintiff was constructively discharged; and (2) the plaintiff was constructively discharged on account of a protected characteristic. *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 440 (7th Cir. 2000). To

14

prevail on a constructive discharge claim, a plaintiff must show not only that defendant's conduct was so severe and pervasive that it altered the conditions of her employment, but also that the working environment was "so intolerable that her resignation became a fitting response." *Pa. State Police v. Suders*, 542 U.S. 129, 133-34, 14 S. Ct. 2342, 159 L. Ed. 2d 204 (2004). A hostile working environment is therefore a predicate to a constructive discharge claim, but the conditions faced by the employee must be even more egregious than those necessary to support an hostile environment claim. *Id.* at 149. Working conditions that intolerable require an "aggravating situation" beyond "ordinary" discrimination, as an employee is otherwise expected to seek legal redress while remaining in his job. *Sears*, 233 F.3d at 440-41; *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997). In addition, "the working conditions must be more than merely intolerable; they must be intolerable in a discriminatory way." *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996).

Here, Fischer cannot even demonstrate that she faced a hostile environment, and thus cannot demonstrate that her resignation was a fitting response. Although Plaintiff alleges a "pattern and practice" of discrimination at Avanade, Plaintiff fails to show facts evidencing egregious discriminatory behavior. After Avanade decided that the Strategic Accounts region would be restructured, Plaintiff accepted a lateral position to Avanade's Central Region. Further, after accepting the transfer, Fischer emailed Fischer expressing her excitement about working in the Central Region with the prospective government proposal. Further, Fischer acknowledged that in September 2005, another employer extended an offer of employment which she accepted. Thus, viewing the evidence and all reasonable inferences in a light most favorable to Fischer, the Court finds no genuine issues of material fact regarding her constructive discharge.

B. Retaliation

Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he [or she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing in this subchapter." 42 U.S.C. § 2000e-3(a). The Seventh Circuit has adopted a burden shifting method, similar to that set forth in McDonnell-Douglas, for plaintiffs who chose to proceed under the indirect method. To establish a claim of retaliation under the indirect method, a Plaintiff must show that "(1) after lodging a complaint about discrimination, (2) only he, and not any otherwise similarly situated employee who did not complain, was (3) subjected to an adverse employment action even though (4) he was performing his job in a satisfactory manner." *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005) (citing *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 642 (7th Cir. 2002)). Once a plaintiff has established a *prima facie* case under the indirect method, the defendant has the opportunity to come forward with a legitimate reason for its action, and if it does, the burden then returns to plaintiff to show this reason to be pretextual. *Sitar v. Indiana Dept. of Transportation*, 344 F.3d 720, 728 (7th Cir. 2003). Fischer cannot prevail under the indirect method because she cannot establish that Avanade's reasons for its actions were pretextual.

First, Plaintiff alleges that in May 2004 she initially informed Tracey Spielmann, Human Resources Manager for Avanade's Central Region and Strategic Accounts Region her opposition with Sieverding's appoint to the Central Region DPMD position without posting the position or allowing Plaintiff the opportunity to apply for the position. Here, Fischer has failed to present any evidence reflecting that she complained that the denial of the position was a result of

16

discriminatory animus. *Id.* at 727-28. Thus, Fischer fails to present evidence demonstrating the first prong under the indirect method.

Next, in April 2005, Fischer, along with several other female Avanade employees, held a conference call with Avanade's CEO to discuss alleged discriminatory employment practices. Subsequently, Fischer filed her complaint with the EEOC on July 21, 2005. In August 2005, Slattery, the Strategic Accounts General Manager, issued a Project Contribution Form which reflected that Fischer's performance "requires improvement." Additionally, Plaintiff alleges that she was retaliated against when she was subjected to audits of her cell phone and broadband expenses, which had previously been approved by another supervisor. While Plaintiff has presented evidence establishing the first prong, Plaintiff fails to establish that she suffered an adverse action pursuant to engaging in the protected activity. Specifically, the Court has before it no evidence that Slattery was aware of Plaintiff's conference call with Avanade's CEO discussing issues of discrimination at the time he informed Spielmann and Lewis that he was concerned regarding Plaintiff's performance and that he wanted to monitor her time entries. Further, Plaintiff fails to demonstrate that the audit or the negative review resulted in Plaintiff suffering an adverse employment action. The Seventh Circuit defines an adverse employment action as:

> A material adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. Of course not everything that makes an employee unhappy will suffice to meet the adverse action requirement.

17

*Traylor v. Brown*, 295 F.3d 783, 788-89 (7th Cir. 2001); *Grube v. Lau Industries, Inc.*, 257 F.3d 723, 729 (7th Cir. 2001)("unfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions.")   Accordingly, there are no genuine issues of material fact regarding Fischer's retaliation claim.

III. Conclusion

For the reasons set forth above, Defendant Avanade's motion for summary judgment is GRANTED.

IT IS SO ORDERED.

_3/30/07_
Dated

Wm. J. Hibbler
The Honorable William J. Hibbler
United States District Court